IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CAROLYN D. HOLLOWAY,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 12-178-CJP |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Carolyn D. Holloway is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).[1]

**Procedural History**

Ms. Holloway applied for benefits in 2009, alleging disability beginning on April 13, 2008. (Tr. 101). The application was denied initially and on reconsideration. After a hearing, Administrative Law Judge (ALJ) William L. Hafer denied the application on December 3, 2010. (Tr. 11-18). Plaintiff's request for review was denied by the Appeals Council, and the December 3, 2010, decision became the final agency decision. (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 11.

-1-

**Issues Raised by Plaintiff**

Plaintiff raises the following issues:

(1) The ALJ erred in that he failed to consider or misstated evidence favorable to plaintiff's claim.

(2) The ALJ's determination of plaintiff's credibility is patently wrong.

(3) Because of the above errors, the ALJ's assessment of plaintiff's RFC is erroneous.

(4) The ALJ erred in weighing the medical evidence, specifically, in the weight he afforded to the opinions of her treating rheumatologist, Mark Stern, M.D.

(5) Because of the above errors, the ALJ's decision was not supported by substantial evidence.

**Applicable Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged

to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant has a severe impairment but does not meet or equal a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984).**  The Commissioner bears the burden of showing that there are a significant number of jobs in the economy that claimant is capable of performing.  **See,** *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether Ms. Holloway was, in fact, disabled during the relevant time period, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. **See,** *Books v. Chater*, **91 F.3d 972, 977-978 (7th Cir. 1996) (citing** *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir.1995)).**

This Court uses the Supreme Court's definition of "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).** In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**; ***Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Hafer followed the five-step analytical framework described above. He found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, and that she is insured for DIB through March 31, 2012. He concluded that plaintiff has severe impairments of fibromyalgia and heel spurs. He found that her alleged mental impairment was not severe, and that her impairments do not meet or equal a listed impairment. (Tr. 13-14)

The ALJ concluded that plaintiff had the residual functional capacity (RFC) to perform a limited range of light work. The ALJ concluded that plaintiff's statements about her symptoms were not credible to the extent that they conflicted with this RFC assessment. (Tr. 14-17). At step 4, the ALJ determined that plaintiff was able to perform her past relevant work as a bartender and cashier, and was therefore not disabled. (Tr. 17-18).

### The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written

record, focused on the issues raised by plaintiff.[2]

**1.     Agency Forms**

Ms. Holloway was born in 1957 and was 51 years on the alleged date of disability. (Tr. 117). She is insured for DIB through March 31, 2013. (Tr. 109).

In a Disability Report, plaintiff stated that she was 5'10" and weighed 170 pounds. She said she had fibromyalgia, colitis and arthritis. She said she was fatigued, had severe pain and was unable to stand for very long, lift or carry. She stopped working on April 13, 2008, because she was unable to physically do the work. (Tr. 121).

Plaintiff worked as a bartender in a VFW club and as a cashier/stockperson in a grocery store. She had also worked as a cook in a restaurant. (Tr. 141). She completed the 9th grade in school. (Tr. 128).

In a Function Report, plaintiff stated that she lived with her husband. She said that she tries to do housework, but, on some days, she can do very little. She does a little bit at a time. She said that she hurts constantly and her physical activity is limited. Her pain and fatigue vary from day to day, and she tries to do what she can. Her husband helps her. (Tr. 132-140).

**2.     Evidentiary Hearing- September 23, 2010**

Plaintiff was represented at the hearing by an attorney. (Tr. 3).

Plaintiff testified that she had worked as a bartender in social clubs for years. She did the typical duties, such as stocking the bar and mixing drinks. She also worked as a cashier and stocker in a grocery store from January to April, 2008. She was unable to lift some items in that

---

[2] As plaintiff has not challenged the finding that she does not have a severe mental impairment, the Court will not delve into the evidence regarding her mental and emotional status in any great detail.

job, such as cases of soda.  She quit work in April, 2008, because she could not take standing any more, and lifting all the food, scanning it, and bending over to put it in a cart was too much for her.  (Tr. 35-36).

Ms. Holloway testified that her worst pain is in her feet, legs and back.  To reliever her pain, she stays off her feet and does exercises given to her by her doctor.  She also has pain medication which she does not like to take unless absolutely necessary.  (Tr. 36-37).  She has intermittent pain and swelling in her hands.  (Tr. 47).

Plaintiff testified that she can sit for about 20 minutes and can stand for 20 to 30 minutes.  (Tr. 38).  She had surgery on her foot on July 13, 2010,  and "it didn't turn out well."  Dr. Graham did the surgery.  She has plantar fascitis.  Since the surgery, she had less throbbing heel pain, but it is still there.  She had 2 steroid shots in her foot the day before the hearing.  (Tr. 38- 40).

She testified that she does not do much.  She lays down for one-third to one-half of the day.  She tries to do housework.  She gets more fatigued as the afternoon progresses.  (Tr. 41).

She has side effects of dry mouth, headaches and drowsiness from her medications.  She takes Cymbalta for fibromyalgia, and it interferes with her concentration.  (Tr. 43-44).

A vocational expert (VE) testified that Ms. Holloway's prior work as a bartender and cashier was light and semiskilled.  (T. 48).

The ALJ asked the VE to assume a person who could lift 20 pounds occasionally and 10 frequently, sit, stand or walk each 6 out of 8 hours, limited to no ladders, ropes, scaffolds, and only occasional climbing stairs, stooping, kneeling, crouching and crawling, with no work at unprotected heights.  The VE testified that such a person would be able to do plaintiff's past relevant work.  (Tr. 49).  If the person could only stand and walk for 2 out of 8 hours, she could

not do plaintiff's past work.  (Tr. 49).

**3.**     **Medical Records**

A note from Clay Medical Center dated March 6, 2008, states that Ms. Holloway had a history of fibromyalgia and had recently started taking Lyrica instead of Amitripyline.  She had some improvement in pain but still had joint pain and muscle aches.  She had started working as a cashier 15 hours a week, which had increased her symptoms.  (Tr. 314).  On May 8, 2008, she complained of left elbow pain and left knee pain.  Her left knee gave out while climbing stairs, causing her to hurt her right knee.  She was told to use Ibuprofen and anti-inflammatories, and to get braces for her elbow and knee.  She was given a Lidocaine injection in the left knee.  She had no insurance and could not afford to see an orthopedic doctor.  (Tr. 316).

In September, 2008, she told a physician's assistant at Clay Medical that she wanted to discontinue Lyrica because it was causing memory loss and confusion.  She was switched to Diclofenac.  She complained of muscle and joint aching, and pain in her right heel.  She refused a Kenalog injection into her right heel.  (Tr. 318).

In November, 2008, Ms. Holloway saw Dr. Rubio at Southern Illinois Healthcare Foundation for complaints of pain and fatigue.  Dr. Rubio referred her to a rheumatologist, Dr. Stern.  (Tr. 241-244).

Plaintiff was first seen by Dr. Mark Stern on January 30, 2009.  His note states that she was being seen "for her fibromyalgia" and she said she had been having pain all over.  On exam, Dr. Stern noted pain in many areas, including left shoulder, neck, thoracic spine, lumbar spine, hips and right metatarsal joint and foot.  She had weakness in the right leg.  He noted that she walked with a limp on the right.  She had a large spur on the right heel.  X-rays of the lumbar

spine were negative. He recommended a lumbar MRI, and prescribed Decadron. He referred her to physical therapy for a heel brace or cushion. (Tr.252 -254). Dr. Stern saw plaintiff again in February, 2009, and noted that Decadron did not give her much benefit. He prescribed physical therapy for her right heel pain. (Tr. 251).

Ms. Holloway attended 12 physical therapy sessions from February 26 to March 25, 2009. According to the discharge note, "no significant improvement [was] noted." (Tr. 208).

On April 23, 2009, Dr. Stern injected her right heel with Depo-Medrol. (Tr. 249-250). In June, 2009, Dr. Stern noted that she had chronic complaints of soft tissue pain. He found tenderness in a number of areas tested, including forearm, upper arm, trapezius, right gluteal muscle and thighs. His assessment was fibromyalgia. He prescribed Celebrex, Flexeril and Zanaflex. She was also given Decadron "if she needed it for emergency reasons." (Tr. 269). In June and again in August, 2009, Dr. Stern detected tenderness in a number of areas on physical examination. (Tr. 268-270). In December, 2009, Dr. Stern again noted fibromyalgia and right heel pain with plantar fascitis. He again injected the right heel. (Tr. 302-303).

Dr. Stern completed a report entitled Residual Functional Capacity Report on March 15, 2010. This form asked the doctor to assume that she was capable of no more than light exertional work. He wrote that her diagnoses were fibromyalgia, facet degeneration at L5-S1 level, and plantar spur on the right. For objective findings, he wrote "soft tissue pain and multiple trigger points." He opined that she should avoid even moderate exposure to extremes of temperature, environmental irritants and hazards such as machinery and heights. He also opined that she would miss work about twice a month due to her impairments or treatment. (Tr. 310-312).

Dr. Stern saw plaintiff on May 19, 2010. He noted that her fibromyalgia was unchanged. He also noted that she still had pain in her right heel despite trying heel injections, pain patches and physical therapy. Dr. Stern adjusted her medications. Zanaflex, Cymbalta and Alprazolam were increased, and Feldene was discontinued. He added Darvocet as needed. (Tr. 338-339).

Ms. Holloway began seeing a podiatrist, Dr. James Graham, for her right heel pain on February 26, 2010. He noted a history of right heel pain for the past 18 months. She was not as tender since her heel had been injected by Dr. Stern, but she still had throbbing pain. He noted that she was "active in housework duties." Dr. Graham noted positive Tinel's and Valleix's signs of the tibial nerve and its branches on neurological exam. The assessment was plantar fascitis, bursitis, hypermobile foot, TTS and pain in limb.[3] Orthotics were prescribed. (Tr. 343-344). In March, 2010, Dr. Graham injected plaintiff's foot with steroids and discussed surgery. (Tr. 345). In May, 2010, Dr. Graham noted that she continued to have pain in her right foot. He again noted positive findings on neurological testing of the tibial nerve, and diagnosed TTS as well as plantar fascitis. He discussed doing an endoscopic plantar fasciotomy alone, or in conjunction with a tarsal tunnel decompression (TTD). A TTD procedure would involve general anesthetic and 3 weeks in a nonweightbearing cast. (Tr. 346). She returned in July, 2010, and Dr. Graham noted that she had 18 months of right heel pain and had failed conservative

---

[3]TTS stands for tarsal tunnel syndrome. According to the website of the American College of Foot and Ankle Surgeons, "Tarsal tunnel syndrome is a compression, or squeezing, on the posterior tibial nerve that produces symptoms anywhere along the path of the nerve running from the inside of the ankle into the foot. Tarsal tunnel syndrome is similar to carpal tunnel syndrome, which occurs in the wrist. Both disorders arise from the compression of a nerve in a confined space." See, http://www.foothealthfacts.org/footankleinfo/tarsal-tunnel-syndrome.htm, accessed on October 10, 2012.

treatment. She opted to have the plantar fasciotomy done and to defer treatment of her TTS. Dr. Graham wrote, "Patient realizes some of this [pain] is due to the TTS. Patient also realizes we are trying to go for plantar fascial release and defer to a later date as this is more conducive to the patient's active lifestyle." (Tr. 346).

The surgery took place on July 13, 2010. (Tr. 349). There were 4 postoperative visits. The last visit was on August 30, 2010. Dr. Graham wrote that she had only 40% improvement. She continued to have pain. She again had positive findings on neurological testing of the tibial nerve, and the diagnoses were TTS, plantar fascitis, bursitis, hypermobile foot and pain in limb. (Tr. 348).

**4.    RFC Assessment**

State agency consultant Charles Wabner, M.D., reviewed medical records and assessed plaintiff's residual functional capacity (RFC) on July 6, 2009. He indicated that the primary diagnosis was fibromyalgia, with a secondary diagnosis of rectal polyp and "other alleged impairment" of osteoarthritis. He opined that Ms. Holloway was able to meet the exertional requirements of light work, that is, occasionally lifting 20 pounds, frequently lifting 10 pounds, standing/walking for 6 out of 8 hours, sitting for 6 out of 8 hours, and unlimited ability to push/pull with upper and lower extremities. He opined that she was further limited to only occasional climbing of ladders, ropes and scaffolds due to fibromyalgia, but she had no other postural limitations. She had no manipulative limitations, and the only environmental limitation was that she should avoid concentrated exposure to hazards such as machinery and heights. (Tr. 258-265).

Four months later, a second state agency consultant agreed with the above RFC

assessment. (Tr. 298-300).

## Analysis

Plaintiff is correct that the ALJ failed to adequately consider the medical evidence in that he ignored medical evidence favorable to her claim.

"The ALJ is not required to discuss every piece of evidence, but must build a logical bridge from evidence to conclusion." **Vilano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009), and cases cited therein.** In building the logical bridge, the ALJ cannot simply ignore a line of evidence that contradicts his conclusions. Rather, he must "confront evidence that does not support his conclusion and explain why it was rejected*.*" **Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004).**

Here, ALJ Hafer's discussion of the medical evidence leaves much to be desired. He consistently "cherry-picked" evidence that tended to minimize plaintiff's impairments while ignoring evidence that suggested that she was more limited than his RFC assessment would indicate. For instance, the ALJ ignored objective and clinical findings recorded by Dr. Stern on several visits. He failed to note that Dr. Stern found hypertrophic changes to some of the joints in plaintiff's fingers and tenderness in many areas of the body on January 30, 2009. (Tr. 252-254). With regard to the physical therapy records, he highlighted interim notes documenting some relief of pain and soreness, but ignored the discharge evaluation which stated that "no significant improvement [was] noted." (Tr. 208). He ignored the fact that Dr. Stern injected plaintiff's right heel twice after her discharge from physical therapy, which suggests that physical therapy was not nearly as successful as the ALJ viewed it to be.

The ALJ was very selective in his discussion of Dr. Stern's notes from February 18, 2009,

through May 19, 2010.  For instance, citing to Dr. Stern's note of August 18, 2009, he said that a joint examination showed no evidence of active inflammation, while failing to recognize that Dr. Stern recorded tenderness in numerous areas on soft tissue examination.  See, Tr. 267.  Similarly, he remarked that a May, 2010, "physical and joint examination was unremarkable except for the subjective complaint of 'mild right heel pain.'" (Tr. 15).  In fact, on that visit, Dr. Stern noted in the history that her fibromyalgia was unchanged and she was experiencing increasing fatigue.  He changed her medications, increasing the dosage of  Zanaflex, Cymbalta and Alprazolam, discontinuing Feldene, and adding Darvocet as needed.  (Tr. 338-339).

The ALJ's analysis of Dr. Stern's records suggests that he did not understand the nature of fibromyalgia, which the Seventh Circuit has described as a "common, but elusive and mysterious, disease."  **Sarchet v. Chater**, **78 F.3d 305, 306 (7th Cir. 1996)**.  The ALJ highlighted the absence of positive results on x-ray, EMG and MRI testing, but such negative test results are not relevant to the diagnosis or severity of fibromyalgia:

> Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

**Sarchet, Ibid.**

In similar fashion, the ALJ selectively discussed Dr. Graham's records, omitting any mention of the positive neurological findings and the diagnosis of TTS.  The ALJ failed to acknowledge that Dr. Graham diagnosed two separate conditions affecting plaintiff's right foot, each of which would be addressed by a separate surgical procedure.  Dr. Graham performed only

the procedure to relieve plantar fascitis; as of his last office visit, plaintiff continued to have positive findings with respect to the tibial nerve on neurologic exam and Dr. Graham continued to indicate a diagnosis of TTS.  See, Tr. 348.  The ALJ ignored this evidence, highlighting instead that she had a 40% improvement. (Tr. 15).  In fact, Dr. Graham recorded that she had "only 40% improvement with plantar fascitis, bursitis, and heel pain." (Tr. 348).  The ALJ failed to recognize that this assessment did not include her TTS, since the surgery did not address that condition.

      Plaintiff is also correct that the ALJ's credibility determination was erroneous.

      ALJ Hafer expressed his credibility findings using the type of "meaningless boilerplate" language which the Seventh Circuit has repeatedly criticized.  **See, *Bjornson v. Astrue*, 671 F.3d 640, 644-646 (7th Cir. 2012), and cases cited therein.**  He said that Ms. Holloway's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 14).

      The ALJ's statement is meaningless because he says that plaintiff's impairments could reasonably be expected to cause *some* of her alleged symptoms, but he never identifies which ones.  In addition, the ALJ put the cart before the horse by determining Ms. Holloway's RFC first, without regard to her credibility, and then rejecting plaintiff's statements to the extent that they did not mesh with his RFC findings.  This approach "turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in

order to come to a decision on the merits." **Brindisi v. Barnhart**, **315 F.3d 783, 787-788 (7th Cir. 2003)**.

Citing **Richison v. Astrue**, **462 Fed. Appx. 622 (7th Cir. 2012)**, the Commissioner correctly points out that the use of the boilerplate language is not necessarily fatal. In that case, the ALJ's credibility determination was affirmed because he explained "which of [plaintiff's] statements he did not credit and why...." **Richison, supra, at 625-626.**

The Commissioner's argument is correct as a general principle, but it does not save the ALJ's decision here. The Seventh Circuit recently reiterated that the ALJ must determine a claimant's credibility by considering the factors set forth in 20 C.F.R. §404.1529(c) and must support his credibility findings with evidence in the record. "Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing." **Shauger v. Astrue,** **675 F.3d 690, 696 (7th Cir. 2012)**. The only attempt ALJ Hafer made to support his credibility findings was to refer to daily activities, the fact that plaintiff cancelled some doctor's appointments, and the fact that medication controlled her symptoms to some degree. (Tr. 17).

The ALJ's reasons are not supported by the record and are not sufficient to sustain his credibility findings. According to the ALJ, Ms. Holloway testified to "daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 17). Ms. Holloway actually testified that she tried to do housework and yardwork, but had to do a little at a time and had to recline or lay down in between, and she became more fatigued as the afternoon progressed. (Tr. 41, 46-47). The Seventh Circuit has pointed out that there are "critical differences" between activities of daily living and a full-time

job, and has noted that the "failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." **Bjornson v. Astrue**, 671 F.3d 640, 647 (7th Cir. 2012). While it is proper for an ALJ to consider daily activities, the ALJ "must explain perceived inconsistencies between a claimant's activities and the medical evidence.." **Jelinek v. Astrue**, 662 F.3d 805, 812 (7th Cir. 2011). The limited daily activities testified to by Ms. Holloway do not support the conclusion that she is capable of full-time employment as a bartender or cashier.

      The ALJ said that plaintiff cancelled appointments on a "number" of occasions. In fact, she cancelled 3 appointments at Clay Medical Center between May, 2008, and January, 2009. (Tr. 203-205). The record contains no explanation for the cancellations, and three cancelled visits is minor in view of the amount of medical treatment Ms. Holloway received.

      Lastly, the ALJ referred to plaintiff's use of medication. Again, he misstated the record, saying that her claim of side effects from Lyrica "did not result in medication changes." (Tr. 17). In fact, Lyrica was discontinued in September, 2008, because of side effects. (Tr. 318).

      Much of the ALJ's decision consists of an incomplete and selective discussion of the medical evidence. This discussion was wholly inadequate to support the ALJ's adverse credibility findings. The ALJ may not selectively discuss the evidence, ignoring the parts that conflict with his decision. **Myles v. Astrue**, 582 F.3d 672, 678 (7th Cir. 2009); **Godbey v. Apfel**, 238 F.3d 803, 808 (7th Cir. 2000).

      The ALJ's errors require remand. However, it should be clear that this Court is not making any suggestion as to whether plaintiff is, in fact, disabled, or as to what the ALJ's decision should be on reconsideration.

Remand of a social security case can only be ordered pursuant to sentence four or sentence six of 42 U.S.C. § 405(g).  A sentence four remand depends upon a finding of error, and is, itself, a final, appealable order.  In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct.  A sentence six remand is not an appealable order.  See, *Shalala v. Schaefer*, 509 U.S. 292, 296-298 (1993);  *Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7th Cir. 1999).

Here, a sentence four remand is appropriate.  Upon remand pursuant to sentence four, judgment must be entered.  *Shalala v. Schaefer*, 509 U.S. 292, 297-298 (1993).

### Conclusion

For the reasons discussed above, plaintiff's Motion for Summary Judgment **(Doc. 19)** is **GRANTED.**

The Commissioner's final decision denying Carolyn D. Holloway's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATED:  October 10, 2012.

                                 s/ Clifford J. Proud
                                 CLIFFORD J. PROUD
                                 UNITED STATES MAGISTRATE JUDGE